**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| CHARLES WILSON, Derivatively on Behalf of MEDICAL PROPERTIES TRUST INC.,<br>501 Fifth Avenue, 19th Floor<br>New York, New York 10017<br><br>Plaintiff,<br><br>v.<br><br>G. STEVEN DAWSON<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>CATERINA A. MOZINGO<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>EMILY W. MURPHY<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>ELIZABETH N. PITMAN<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>D. PAUL SPARKS, JR.<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>MICHAEL G. STEWART<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>C. REYNOLDS THOMPSON, III<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202<br><br>EDWARD K. ALDAG, JR.<br>11 East Chase Street, Suite 9E<br>Baltimore, Maryland 21202 | Case No.: |

R. STEVEN HAMNER
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

J. KEVIN HANNA
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

Defendants,

and,

MEDICAL PROPERTIES TRUST, INC.
11 East Chase Street, Suite 9E
Baltimore, Maryland 21202

Serve: The Corporation Trust Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland
21093-2264

Nominal Defendant.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff Charles Wilson ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Medical Properties Trust, Inc. ("Medical Properties" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein

after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and/or directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have occurred from May 23, 2023 through August 18, 2023 (the "Relevant Period") and have caused substantial harm to the Company.

2. On May 23, 2023, the Company issued a press release in which it announced that it had entered into a recapitalization transaction (the "Recap Transaction") with Prospect Medical Holdings, Inc. ("Prospect"), a healthcare management services organization. Under the Recap Transaction, Medical Properties would take an equity stake in Prospect's managed care business, PHP Holdings, LLC ("PHP"), in lieu of any cash payment of outstanding loans and any accrued rent and interest owed by Prospect to Medical Properties.

3. Through the Relevant Period, the Individual Defendants made, or caused or permitted to be made, false or misleading statements and/or omitted material adverse information regarding the Company's business, operations, and prospects, including: (i) the Recap Transaction was subject to regulatory approval and had in fact been placed on hold by the Department of Managed Health Care of the Health and Human Services Agency of the State of California ("DMHC"); (ii) accordingly, Medical Properties had misrepresented the regulatory process for the Recap Transaction's approval; and (iii) as a result of the foregoing, Medical Properties overstated the approval prospects and benefits of the Recap Transaction.

4. On August 18, 2023, the truth regarding the Recap Transaction's approval was revealed when the *Wall Street Journal* ("WSJ") published an article entitled "Cracks Deepen for

America's Biggest Hospital Landlord: Struggling Tenants, a Bailout on Hold" which discussed DMHC's decision to halt the Recap Transaction and the negative impact the Company and Prospect could experience if the deal is permanently rejected.

## JURISDICTION

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Sections 10(b), and 21D of the Securities Exchange Act of 1934 ("Exchange Act"). This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

6. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

8. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

9. ***Plaintiff Charles Wilson*** is, and was at relevant times, a shareholder of the Company. Plaintiff Wilson will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff is a citizen of Florida.

**Nominal Defendant**

10. ***Nominal Defendant Medical Properties*** is a Maryland corporation with its principal executive offices at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama, 35242. Nominal Defendant Medical Properties is a citizen of Maryland and Alabama.

**Director Defendants**

11. ***Defendant G. Steven Dawson*** ("Dawson") has served as a Company director since 2004. Defendant Dawson also serves as the Chair of the Audit Committee and as a member of the Investment Committee. For Fiscal Year 2022, Defendant Dawson received $275,475 in total compensation from the Company. This included $150,000 in fees earned or paid in cash and $125,475 in stock awards. Defendant Dawson is a citizen of Alabama.

12. ***Defendant Caterina A. Mozingo*** ("Mozingo") has served as a director of the Company since February 2020. Defendant Mozingo also serves as the Chair of the Environmental and Social Committee and as a member of the Risk Committee. For Fiscal Year 2022, Defendant Mozingo received $270,475 in total compensation from the Company. This included $145,000 in fees earned or paid in cash and $125,475 in stock awards. Defendant Mozingo is a citizen of Alabama.

13. ***Defendant Emily W. Murphy*** ("Murphy") has served as a director for the Company since 2022. Defendant Murphy also serves as a member of the Ethics, Nominating and Corporate

Governance Committee and the Environmental and Social Committee. For Fiscal Year 2022, Defendant Murphy received $207,538 in total compensation from the Company. This included $86,250 in fees earned or paid in cash and $121,288 in stock awards. Defendant Murphy is a citizen of Alabama.

14. ***Defendant Elizabeth N. Pitman*** ("Pitman") has served as a director of the Company since 2018. Defendant Pitman also serves as the Chair of the Nominating and Corporate Governance Committee, Chair of the Risk Committee, as a member of the Ethics Committee, and as a member of the Environmental and Social Committee. For Fiscal Year 2022, Defendant Pitman received $285,475 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $125,475 in stock awards. Defendant Pitman is a citizen of Alabama.

15. ***Defendant D. Paul Sparks*** ("Sparks") has served as a director of the Company since 2014. Defendant Sparks also serves as a member of the Audit Committee, Compensation Committee, and Investment Committee. For Fiscal Year 2022, Defendant Sparks received $255,475 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $125,475 in stock awards. Defendant Sparks is a citizen of Alabama.

16. ***Defendant Michael G. Stewart*** ("Stewart") has served as a director of the Company since 2016. Defendant Stewart also serves as a member of the Environmental and Social Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Ethics Committee. For Fiscal Year 2022, Defendant Stewart received $290,475 in total compensation from the Company. This included $165,000 in fees earned or paid in cash and $125,475 in stock awards. Defendant Stewart is a citizen of Alabama.

17. ***Defendant C. Reynolds Thompson*** ("Thompson") has served as a director of the Company since 2016. Defendant Thompson also serves as the Chair of the Compensation

Committee, as a member of the Audit Committee, and as a member of the Investment Committee. For Fiscal Year 2022, Defendant Thompson received $270,475 in total compensation from the Company. This included $145,000 in fees earned or paid in cash and $125,475 in stock awards. Defendant Thompson is a citizen of Alabama.

18. The above-named defendants at ¶¶ 11–17 are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

19. ***Defendant Edward K. Aldag, Jr.*** ("Aldag") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board since 2004. Defendant Aldag co-founded the Company in 2003. Defendant Aldag also serves as the Chair of the Investment Committee and as a member of the Environmental and Social Risk Committee.[1] Defendant Aldag is a citizen of Alabama.

20. ***Defendant R. Steven Hamner*** ("Hamner") has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since September 2003 and also as a Company director since 2005. For Fiscal Year 2022, Defendant Hamner received $8,163,771 in total compensation from the Company. This included $675,000 in salary, $303,750 in bonuses, $6,190,172 in stock awards, $961,875 in non-equity incentive plan compensation, and $32,974 in all other compensation. Defendant Hamner is also a member of the Investment Committee and the Risk Committee. Defendant Hamner is a citizen of Alabama.

[1] As noted *infra*, with respect to demand futility only, the term "Director Defendants" shall also refer to Defendants Aldag and Hamner.

21. ***Defendant J. Kevin Hanna*** ("Hanna") serves as the Company's Senior Vice President, Controller CAO, and has served as a Company employee since 2008. Defendant Hanna is a citizen of Alabama.

22. The above-named defendants at ¶¶ 19–21 are collectively referred to herein as the "Officer Defendants."

23. The Director Defendants and the Officer Defendants are collectively referred to herein as the "Individual Defendants."

## FACTUAL BACKGROUND

### Medical Properties

24. Incorporated in Maryland in 2003, Medical Properties is a self-advised real estate investment trust ("REIT") with investments in 444 facilities and approximately 44,000 licensed beds in 31 states across the U.S., seven countries in Europe, across Australia, and in one country in South America (*i.e.*, Colombia).

25. The Company's primary business strategy is to acquire and develop healthcare facilities and lease the facilities to healthcare operating companies under long-term net leases, which require the tenant to bear most of the costs associated with the property.

26. While the majority of Medical Properties' leased assets are owned 100%, the Company owns some leased assets through joint ventures with other partners. The Company extends mortgage loans to healthcare operators collateralized by their real estate assets. In addition, it makes loans to certain of its operators through its taxable REIT subsidiaries ("TRS"), the proceeds of which are typically used for working capital and other purposes.

27. Additionally, Medical Properties occasionally makes noncontrolling investments in its tenants as investments in unconsolidated operating entities. These investments are typically

made in conjunction with larger real estate transactions with the tenant that allow the Company to share in that tenant's profits and losses, as well as affording the Company certain minority rights and protections. The Company's business model is to facilitate acquisitions and recapitalizations with the purported goal of "allow[ing] operators of healthcare facilities to serve their communities by unlocking the value of their real estate assets to fund facility improvements, technology upgrades, and other investments in operations."

**<u>The 2019 Agreement with Prospect</u>**

28. On July 15, 2019. Medical Properties filed with the SEC a Form 8-K that announced that on July 10, 2019, the Company had acquired 14 hospitals and behavioral health facilities in the Prospect Medical Holdings, Inc. portfolio (previously defined as the "Prospect Properties"), including the following acute care hospitals: Crozer-Chester Medical Center in Upland, Pennsylvania; Springfield Hospital located in Springfield, Pennsylvania; Taylor Hospital located in Ridley Park, Pennsylvania; and Delaware County Memorial Hospital located in Drexel Hill, Pennsylvania (previously defined as the "Pennsylvania Properties"). Through this transaction, MPT, as the Company's operating entity, entered into a definitive agreement whereby Medical Properties would acquire the Prospect Properties and lease them back to Prospect, which, as the tenant, would pay the Company rent.

29. In full, Medical Properties' July 15, 2019 Form 8-K provided as follows:

> **Item 1.01. Entry into a Material Definitive Agreement.**
>
> ***Acquisition of Prospect Hospital Portfolio***
>
> On July 10, 2019, the Operating Partnership entered into definitive agreements pursuant to which certain of its subsidiaries will invest approximately $1.55 billion in a portfolio of 14 acute care hospitals and two behavioral health facilities currently owned and operated by Prospect Medical Holdings, Inc. ("Prospect").

> Under the terms of the agreements, certain subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of 11 acute care hospitals and two behavioral health facilities for an aggregate purchase price of approximately $1.4 billion. Such hospitals and facilities will then be leased back to Prospect under two separate master leases. In addition, (i) a subsidiary of the Operating Partnership will make a mortgage loan in the amount of approximately $51.3 million, secured by a first mortgage on an acute care hospital, and (ii) a subsidiary of the Company's taxable REIT subsidiary will make a term loan of approximately $112.9 million, which will mature upon the earlier of three years or the satisfaction of certain conditions. After the maturity of the term loan and upon satisfaction of certain conditions, other subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of two additional acute care hospitals, which real estate will be added to one of the master leases. The master leases, mortgage loan, and term loan will be cross-defaulted and cross-collateralized. The master leases and mortgage loan will have substantially similar terms, with 15-year fixed term subject to three extension options, plus annual increases at the greater of CPI or 2%, with a cap of 4%.
>
> The table below sets forth pertinent details with respect to the hospitals and behavioral health facilities in the Prospect portfolio:
>
> The agreements provide for the potential for a future purchase price adjustment of up to an additional $250.0 million based on achievement of certain performance thresholds over a three-year period. Any such adjustment will be added to the lease base upon which the Company will earn a return in accordance with the master leases.
>
> Subject to customary closing conditions, the Company expects to consummate the transactions described above in the second half of 2019 with respect to all of the real estate other than the two properties subject to a delayed closing.
>
> The Company intends to finance the transaction with funds from various financing arrangements, which may include borrowings under the bridge loan facility described below and revolving credit facility, proceeds from security issuances, cash on hand or a combination thereof. We cannot assure you that we will be able to successfully complete the Prospect investment on the terms described or at all.

30. However, with respect to this 2019 Agreement, the Company made materially false or misleading statements and/or failed to disclose material facts, including, *inter alia*, that: (i) the Company masked the distressed state of its tenants through sale-leaseback arrangements which were essentially round-robin transactions in that they allowed debt-saddled tenants to meet their

obligations in the short-term; (ii) the Company fraudulently transferred hundreds of millions of dollars in what amounted to a bailout of financially distressed tenants; and (iii) the Company concealed its fraudulent transfers with fake construction projects with purportedly high capital expenses, despite the fact that the Company entered into "triple-net leases," which meant that its tenants were obligated to pay a significant portion of expenses, such as real estate taxes, insurance, and maintenance.

31. On January 26, 2023, Viceroy Research published an extensive report on the Company (the "Viceroy Report"). The Viceroy Report, entitled "Medical Properties (dis)Trust," accused certain officers and/or directors of engaging in "***billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and/or theft***." The Report identified four separate – though occasionally overlapping – types of "uncommercial transactions" by which the officers and/or directors "roundtripped" cash back to the Company, the result of which was that the Company's assets, including the Pennsylvania Properties and other Prospect Properties, were "massively overstated":

a. Sale-Leaseback: The Company generally acquired properties on leaseback terms such that the seller of the asset becomes the tenant. In many instances, the counterparty to these transactions is distressed. As the Viceroy Report explains, Medical Properties "appear[s] to constantly overpay for fire sale assets, sometimes by as much as 10x, which in turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term." According to Viceroy, the Company has engaged in billions of dollars of uncommercial sale-leaseback transactions to prop up a non-performing (*i.e.*, non-rent-paying) asset.

b. Cash Giveaways: The Viceroy Report alleges that Medical Properties "engages in various transactions with a common cast of friends in which hundreds of millions of dollars go missing. [The Company] has disappeared hundreds of millions of dollars in what appear to be fraudulent transactions." Here, the value of the underlying asset is only a fraction of the value of the transaction. Yet only a fraction of the consideration to be paid is actually received by the vendor because it appears that "a middle-man" brokers the transaction and keeps a portion of the consideration. According to the Viceroy Report, the use of these brokers allows money to be siphoned off unaccounted for.

c. Bailouts: According to the Viceroy Report, the Company has spent hundreds of millions of dollars bailing out distressed tenants. Medical Properties may acquire equity in a failing tenant or issue the tenant a loan in order to mast uncollectable rent through what is essentially the round-tripping of revenues. These bailouts allowed the Company to avoid recording an impairment for distressed assets.

d. Capex ASSISTANCE AND Fake Builds: Finally, the Viceroy Report detailed a practice whereby the Company will "collude" with a tenant to fabricate fake projects in order to hide money in phony expenses. According to the Viceroy Report:

- Various of MPW's ongoing developments appear to be either non-existent or have not broken ground. Despite this, MPW claim to have spent tens of millions of dollars on each development. Site visits of barren construction sites and local news sources suggest this is a lie.

- MPW's tenants are exclusively on triple-net leases, meaning they are on the hook for real estate taxes, insurance, and maintenance. Despite this, various filings and MPW's financial accounts show substantial cash amounts being devoted to capex, including maintenance, of its distressed tenants.

32. The extensive research and analysis undertaken by Viceroy led it to the conclusion that Medical Properties' assets were "massively overstated" and that, simply put, "[the Company] is a subprime asset rolled-up generating prime yields." Included in the Viceroy Report's "Key Takeaways" are as follows:

- MPW has engaged in ***billions of dollars of uncommercial transactions*** with its tenants and their management teams in order to mask a ***pervasive revenue round-robin scheme and / or theft***.

- The value of MPW's assets, as a result of capitalizing these uncommercial transactions, are ***massively overstated***.

- MPW engaged in an aggressive, debt-fuelled [sic] roll-up strategy in order to affect these transactions. ***We believe the true value of MPW's LTV is ~85%, creating enormous credit risk***.

- Many of MPW's tenants are severely distressed. This precedes the need to engage in revenue round-robin transactions.

- ***Financial accounting gimmicks ensure MPW's management are incentivized to continue engaging in uncommercial transactions and possible fraud***. These align with management incentive schemes. [Emphasis added].

33. On February 23, 2023, the Company disclosed its Q4 2022 and year-end 2022 financial results, which lent credence to the concerns raised in the Viceroy Report. The Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2022. The Company disclosed that operating results for Q4 and year-end 2022 were a net loss of ($140) million (($0.24) per diluted share) and net income of $903 million ($1.50 per diluted share), respectively, compared to net income of $207 million ($0.34 per diluted share) and $656 million ($1.11 per diluted share) in the year earlier periods. NFFO for Q4 and year-end 2022 was $258 million ($0.43 per diluted

share) and $1,088 million ($1.82 per diluted share), respectively, compared to $279 million ($0.47 per diluted share) and $1,036 million ($1.75 per diluted share) in the year earlier periods.

34. In addition, in connection with the Q4 and year-end 2022 results, the Company surprised investors by disclosing that it was recording an ***impairment charge of $171 million relating to the Pennsylvania Properties and a write-off of an additional $112 million on unbilled rent to Prospect***. Specifically, the Company stated that:

> [f]ourth quarter 2022 net loss and full-year 2022 net income included a real estate impairment of approximately ***$171 million related to four properties leased to Prospect Medical Holdings ("Prospect") in Pennsylvania*** as well as a write-off of roughly ***$112 million in unbilled Prospect rent*** also included in Funds from Operations ("FFO") but excluded from normalized results. [Emphasis added].

35. Also on February 23, 2023, Medical Properties revealed that its longtime COO and Executive Vice President, Emmett E. McLean, was retiring, effective September 1, 2023.

36. The disclosure of this corrective information, previously concealed to shareholders, cost shareholders. Medical Properties shares declined 8.7%, falling $1.06 per share, from a February 22, 2023 closing price of $12.20 per share to a close on February 23 of $11.14 per share. Company shares continued to lose their value, and by March 1, 2023, the share price closed at $10.07 – a total decline of 17.5%. All told, Medical Properties suffered a market capitalization loss of more than ***$1.25 billion***.

## FALSE AND MISLEADING STATEMENTS

37. The Relevant Period begins on May 23, 2023 when the already damaged (as detailed above) Company issued a press release in which it announced the Recap Transaction. The press release stated:

> Medical Properties Trust, Inc. (the "Company" or "MPT") (NYSE: MPW) today announced that affiliates of Prospect Medical Holdings ("Prospect") have completed $375 million in new financings from third-party lenders, the proceeds of which will be used to provide Prospect's hospital operations with liquidity and

capitalize its managed care business for continued growth and value creation in a vibrant market for such businesses.

Prospect's $250 million asset-backed revolving credit facility has been repaid in full and as a result, the unencumbered borrowing base of government and commercial insurance accounts receivable will provide first lien security for the previously announced MPT delayed draw term loan of up to $75 million. Prospect is expected to be substantially free of material debt or lease obligations outside of those to MPT and this new third-party financing.

MPT continues to have strong conviction in the embedded value of the Prospect platform and has structured its master leases and security agreements to provide collateral value in addition to its real estate interests, including interests in the equity of Prospect's managed care business. As of the end of the first quarter of 2023, MPT holds $1.6 billion in total assets related to Prospect that are expected to be reconstituted as follows:

• An approximately $513 million investment in leased California hospitals, subject to a master lease scheduled to resume partial rent payments in September and full rent payments at an 8.44% cash yield in March of 2024;

• A $457 million investment in MPT's Connecticut real estate which, as previously announced, Yale New Haven Health is expected to acquire in a transaction that is expected to close during 2023's third quarter. MPT's investment is expected to be fully recovered through cash proceeds of $355 million at closing and equity interests in Prospect's managed care business valued at $103 million;

• A first lien mortgage loan of $150 million and equity interests in the managed care business valued at $100 million, resulting from the transfer to Prospect of Pennsylvania real estate with a book value of $250 million;

• Loans aggregating approximately $264 million and accrued rent and interest of approximately $56 million, along with the previously announced $50 million convertible loan to the managed care entities are expected to be recovered through equity interests in the managed care business. The new loan agreements among Prospect, MPT and third-party lenders have terms of approximately three years. During this period, Prospect intends to further build the value of its managed care business and continue operational and financial improvements of its hospital operating business.

38. As a result of PHP's involvement in the deal, the Recap Transaction was subject to regulatory approval by the Department of Managed Health Care of the Health and Human Services

Agency of the State of California ("DMHC"), the regulatory body responsible for governing managed health care plans in California.

39. Just under a month later, on July 20, 2023, the DMHC issued an order (the "DMHC Order"), which put the Recap Transaction on hold until the organization obtained further information from the Company.

40. Yet, despite the DMHC Order, Defendants failed to disclose to investors that the Recap Transaction had been put on hold. Instead, in a press release issued on August 8, 2023, which announced the Company's second quarter 2023 ("2Q23") financial and operating results, the Company stated:

> NFFO for the second quarter ended June 30, 2023 was $285 million ($0.48 per diluted share) compared to $275 million ($0.46 per diluted share) in the year earlier period. Included in 2023 second quarter NFFO is roughly $68 million ($0.11 per diluted share) from the receipt of equity in PHP in lieu of cash for 2023 previously unrecorded but contractually owed rent and interest revenue from Prospect Medical Holdings, Inc. ("Prospect"). In accordance with accounting requirements, the value of MPT's investment in PHP was established at roughly $655 million based on estimates from multiple independent third parties and the application of an appropriate marketability discount.
>
> The Company is narrowing its 2023 calendar estimate of per share net income to $0.33 to $0.37 to account for second quarter results and is also narrowing its estimate of per share NFFO to $1.53 to $1.57. The ranges include Prospect-related income from the expected resumption of partial California rental payments, recognition of the PHP equity value received in the second quarter and other amounts. The estimates are based on an existing portfolio which includes the impact of binding disposition and leasing transactions and excludes expected future contributions from development and other capital projects.

41. That same day, the Company hosted an earnings conference call with shareholders and analysts to discuss the Company's 2Q23 results (the "2Q23 Earnings Call"). With regard to the Recap Transaction, Defendant Hamner stated:

> [...] we recognized about $68 million in Prospect rent and interest. This is based on the previously disclosed Prospect recapitalization transactions that included our

> exchange of certain real estate and other assets for interest in Prospects managed care business.
>
> In brief summary, you will recall our May 23rd announcement that as of the end of the first quarter, we carried those assets at approximately $573 million. After obtaining updated valuations and an appraisal to determine marketability discounts, the estimated value of our interest in managed care as of the May closing was approximately $655 million. That's in addition to our roughly $515 million of leased California hospitals and $355 million of cash that we expect to collect from the sale to Yale of our Connecticut hospitals. Accordingly, we recognized in the second quarter the rent and interest that would have been collected in 2023 through the May closing date.

42. The following day, on August 9, 2023, the Company filed a quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2023 (the "2Q23 10-Q"). The 2Q23 10-Q was signed by Defendant Hanna. Also attached to the 2Q23 10-Q as an exhibit were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Aldag and Hamner, attesting that the "information contained in the [2Q23 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

43. Despite the foregoing, the Company failed to disclose that the DMHC had placed the Recap Transaction on hold. Rather, in discussing the Company's new investments, the 2Q23 10-Q instead stated:

> On May 23, 2023, Prospect completed its recapitalization plan, which included receiving $375 million in new financing from several lenders. Along with this new debt capital from third-party lenders, we agreed to the following restructuring of our $1.7 billion investment in Prospect including: a) maintaining the master lease covering six California hospitals with no changes in rental rates or escalator provisions, and with the expectation that Prospect will begin making cash payments for a substantial portion of the contractual monthly rent due on these California properties starting in September 2023, b) transition the Pennsylvania properties back to Prospect in return for a first lien mortgage on the facilities, c) provide up to $75 million in a loan secured by a first lien on Prospect's accounts receivable and certain other assets, of which we funded $25 million on May 23, 2023, d) complete the previously disclosed sale of the Connecticut properties to Yale New Haven ("Yale"), as more fully described in <u>Note 9</u> to the condensed consolidated financial statements, and e) obtain a non-controlling ownership interest in PHP Holdings of approximately $654 million, after applying a discount for lack of marketability,

> consisting of an approximate $68 million equity investment and $586 million loan convertible into equity of PHP Holdings (collectively, the "Prospect Transaction"). This non-controlling ownership interest was received in exchange for unpaid rent and interest through December 2022, previously unrecorded rent and interest revenue in 2023 totaling approximately $68 million, our $151 million mortgage loan on a California property, our $112.9 million term loan, and other obligations at the time of such investment.
>
> At June 30, 2023, we believe our remaining investment in the Prospect real estate and other assets are fully recoverable, but no assurances can be given that we will not have any further impairments in future periods.

44. Instead of disclosing the DMHC Order to shareholders, the Company disregarded it and continued to tout the benefits of the Recap Transaction in its press release and 2Q23 10-Q by stating that the deal had boosted the Company's revenue.

45. The above-referenced statements were materially false and/or misleading statements and/or omitted material adverse information regarding the Company's business, operations, and prospects, including: (i) the Recap Transaction was subject to regulatory approval and had in fact been placed on hold by the DMHC; (ii) accordingly, Medical Properties had misrepresented the regulatory process for the Recap Transaction's approval; and (iii) as a result of the foregoing, Medical Properties overstated the approval prospects and benefits of the Recap Transaction.

## THE TRUTH EMERGES

46. The truth emerged on August 18, 2023 when the WSJ published an article entitled "Cracks Deepen for America's Biggest Hospital Landlord: Struggling Tenants, a Bailout on Hold." The article revealed the truth about the DMHC Order, publicly disclosing for the first time that the DMHC had placed the transaction between the Company and Prospect on hold. The article stated:

> The nation's largest hospital landlord said an unusual transaction that provided crucial financial support for one of its biggest tenants was a done deal. It wasn't.

The deal was good news for both companies, and for communities across the country concerned that their local hospitals could go broke. The landlord, [Medical Properties] announced the transaction in May. When it reported quarterly results on Aug. 8, it said the arrangement boosted its own revenue.

But a California state regulator on July 20 ordered that the transaction between [Medical Properties] and Prospect [] be put on hold, according to the order that the regulator sent to Prospect. [Medical Properties] didn't disclose the regulator's order when it reported second quarter results, or in its quarterly report filed the next day with the [SEC].

An [Medical Properties] spokesman, Drew Babin, said: "Information is being provided to the relevant agencies, and [Medical Properties] continues to expect to complete the transactions."

* * *

The Prospect deal was designed to alleviate financial stress for both it and [Medical Properties]. Before the deal, Prospect had stopped paying rent, closed two hospitals near Philadelphia, and owed [Medical Properties] hundreds of millions of dollars. [Medical Properties'] own finances are under scrutiny by investors, its shares are down by half over the past year, and it has already suffered large losses on Prospect, its third-largest tenant. If the deal is killed by regulators, it would further pressure the two companies' finances.

* * *

[Medical Properties] announced the deal with Los Angeles-based Prospect on May 23, saying it would receive equity in Prospect's managed-care business—[PHP]—in lieu of cash payment for $573 million of loans, unpaid rent and interest, and other amounts owed. [PHP] owns a small health insurer, Prospect Health Plan, as well as other businesses.

[Medical Properties] didn't disclose whether the transaction with closely held Prospect would require regulatory approval. Last week [Medical Properties] said it owned 49% of [PHP].

It isn't clear how Prospect would pay [Medical Properties] if the regulator, the [DMHC], rejected the deal permanently. The department oversees Prospect Health Plan.

Kevin Durawa, a department spokesman, said the regulator is reviewing the matter and doesn't have a statutory time frame for making a decision. "The department's review includes the plan's decision to move forward with this transaction before the department's approval," he said.

The [WSJ] obtained the [DMHC Order] and other documents from the California regulator through requests under the state's Public Records Act.

Prospect said it was "in no position right now" to answer questions about the [DMHC Order]. The company has been crippled by a ransomware attack that was announced Aug. 3 and took out all of its computer systems, causing emergency room closures and forcing hospital staff to use paper records. Prospect said that emergency departments have reopened but that it doesn't know when all of its systems will be restored.

Babin, the [Medical Properties] spokesman, said the deal is "proceeding through a normal regulatory review process that was expected and is not controversial." He said the company expects the deal to be approved.

* * *

Now, with interest rates higher and money tighter, [Medical Properties] is shrinking. [Medical Properties] has been extending financial support to some of its most-troubled tenants, including Prospect and Steward Health Care. Steward, a for-profit hospital operator based in Dallas, accounted for $3.7 billion, or 19%, of [Medical Properties'] assets as of June 30 and is [Medical Properties'] largest tenant. Prospect and [PHP] together accounted for $1.7 billion, or 9%, of [Medical Properties'] assets.

[Medical Properties] shares fell sharply last week after the company said it lent $140 million to Steward during the current quarter—part of a larger credit package that included other lenders. [Medical Properties] already had more than $500 million of other loans to Steward, which is closely held, plus a $126 million equity investment. On Thursday, [Medical Properties] said it had sold $105 million of the new loan to an unnamed investment firm.

* * *

[Medical Properties'] shares trade at 54% of book value. [Medical Properties] has been borrowing to help pay its dividend, which exceeded operating cash flow in each of the past two quarters. The stock has a 15.5% dividend yield, reflecting concern that the payout might not be sustainable.

[Medical Properties] and Prospect have provided different descriptions, at different points in time, of the details of their deal. The California regulator appears to be concerned about how much control [Medical Properties] would have over Prospect Health Plan. The deal is unusual in part because [Medical Properties], a REIT, would get a big stake in a health insurer.

When the deal was announced, [Medical Properties] didn't say what its percentage ownership of [PHP] would be. Prospect Health Plan has about 73,000 managed-

care enrollees in five Southern California counties. [PHP's] other businesses include physician practice groups.

Prospect Health Plan notified the California regulator of the [Recap Transaction] in a June 23 filing that said an [Medical Properties] subsidiary had "acquired a 49% equity interest" in [PHP], the health plan's parent, on May 23. The health plan said [Medical Properties] acquired its stake by converting $370 million of loans, unpaid rent and interest, and other amounts owed by Prospect Medical Holdings into equity in [PHP]. The health plan called [Medical Properties] a passive investor. It said the deal wasn't a change of control and didn't need the regulator's advance approval.

"The equity interests acquired by [Medical Properties] are not 'voting' interests, although [Medical Properties] was granted blocking rights with respect to certain major decisions" of [PHP], the health plan said. The June 23 filing didn't provide details about the blocking rights.

The [DMHC] on July 20 issued the [DMHC Order] putting the deal on hold. It characterized the deal's terms as "proposing a change of control." The [DMHC] said the order would "remain in effect until revoked or superseded by further order of the director." In an accompanying letter, the regulator said the order "prohibits the plan from implementing the terms" until further notice, because the health plan's proposal "does not demonstrate compliance" with state law.

The [DMHC] also sent the health plan a 12-page list of comments and requests for information. It asked for "a thorough description of the blocking rights," and an explanation of "the circumstances when [Medical Properties] may exercise those blocking rights." The health plan's responses are due Sept. 13, after the regulator granted a deadline extension.

Asked to describe the blocking rights, Babin, the [Medical Properties] spokesman, said "these are standard in any partnership agreement where a significant equity ownership interest exists and the specifics are confidential."

When [Medical Properties] reported second-quarter results last week, its description of the equity deal differed significantly from its previous explanation in May—and from what Prospect Health Plan told the [DMHC] in June.

When [Medical Properties] last week said it had taken a 49% equity interest in [PHP], that percentage figure matched what the health plan had said. [Medical Properties], however, said its "non-controlling ownership interest" was worth $654.5 million as of June 30— based on updated valuations—and consisted of "an approximate $68 million equity investment and $586 million loan convertible into equity of [PHP]." The valuation exceeded the $370 million of Prospect obligations that the health plan in its June 23 filing had said was converted into equity.

> The Prospect deal helped [Medical Properties'] income statement, too. [Medical Properties] said it recorded its receipt of the $68 million equity investment as revenue; that was 20% of its second-quarter revenue. Asked what [Medical Properties'] rationale was for recognizing revenue in light of the [DMHC Order], Babin said "this is governed by accounting regulations."
>
> As a regulated insurer, Prospect Health Plan files financial reports publicly. Other businesses owned by [PHP] don't, making it difficult for outsiders to gauge the unit's value. For the fiscal year ended Sept. 30, 2022, Prospect Health Plan reported net income of $1.9 million, total assets of $30.7 million and total equity of $14.2 million.

47. In response to the *WSJ* Article, the Company issue a press release emphasizing that the DMHC Order was a "standard, expected, and non-controversial part of the approval process for [the Recap Transaction]." Additionally, the press release attempted to excuse the decision of the Individual Defendants to not disclose the DMHC Order to shareholders by stating that the "DMHC's request was deemed immaterial to [the Company's] financials and thus did not require disclosure."

48. On this news, the Company's stock price fell by $0.57 per share, or 7.6%, from closing at $7.50 per share at the closing of trade on August 17, 2023, to close at $6.93 per share at the closing of trade on August 18, 2023.

**STOCK REPURCHASES**

49. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.

50. According to the Form 10-Q, the Company filed with the SEC on November 9, 2023 for the quarter ended September 30, 2023, between July 1, 2023 and July 31, 2023, the Company purchased 56,000 shares of its common stock for approximately $520,240 at an artificially inflated average price of $9.29 per share.

51. As the Company's stock was actually worth only $6.93, the price at closing on August 18, 2023, the Company overpaid by approximately $132,160 for repurchases of its own stock between July 1, 2023 and July 31, 2023.

52. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $132,160.

## **DAMAGES TO THE COMPANY**

### **Securities Class Action**

53. On September 29, 2023, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Armstrong v. Medical Properties Trust, Inc., et al.*, 1:23-cv-08597 (S.D.N.Y.) ("Securities Class Action").

54. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### **Unjust Compensation**

55. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

56. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and

administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

57. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**<u>Share Repurchases</u>**

58. As detailed above, the Individual Defendants caused the Company to repurchase its own shares at artificially inflated prices, thus caused the Company to overpay for its own stock by $132,160.

**<u>Additional Damage to the Company</u>**

59. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

60. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

61. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

62. At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

63. Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Medical Properties, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

64. At all relevant times, the Company had in place its Code of Ethics and Business Conduct ("Code of Conduct") which applies to "[e]ach director, officer, employee."

65. In its first section entitled "Purpose," the Code of Conduct states that the Company was "amending and restating" the Code of Conduct "for the purpose of deterring wrongdoing and promoting" the following:

> • Honest and ethical conduct, including ethical handling of conflicts of interest, anti-corruption, and bribery;
>
> • Full, fair, accurate, timely and understandable disclosure in the Company's filings with the Securities and Exchange Commission, from and after the time the Company is required to make such filings, and other public communications;
>
> • Compliance with applicable laws, rules and regulations;

> • Prompt reporting of violations of the Code; and • Accountability for adherence to the Code.

66. In a section entitled "Honest and Ethical Conduct," the Code of Conduct states the following:

> Each director, officer, employee owes a duty to the Company to act in an honest and ethical manner and to abide by the letter and the spirit of all applicable laws, rules and regulations applicable wherever the Company does business. All directors, officers and employees of the Company are expected to be familiar with the Code and to adhere to those principles and procedures set forth in the Code that apply to them.
>
> The Company's Audit Committee of the Board of Directors (the "Audit Committee") is responsible for administering and interpreting the Code. The Audit Committee has delegated day-to-day responsibility for administrating and interpreting the Code to the Code of Ethics Contact Person. For purposes of this Code, the "Code of Ethics Contact Person" will be the Chief Operating Officer.

67. Regarding conflicts of interest, the Code of Conduct states that "[d]irectors, officers and employees should conduct themselves in a manner that avoids even the appearance of a conflict of interest."

68. Regarding "Compliance," the Code of Conduct states "[i]t is the Company's policy to comply with all applicable laws, rules and regulations. Each director, officer and employee is responsible for adhering to the standards and restrictions imposed by those laws, rules and regulations."

69. In a section entitled "Public Company Reporting," the Code of Conduct states the following:

> It is of critical importance that the Company's filings with the Securities and Exchange Commission ("SEC") and related public disclosures be accurate and timely. Depending on his or her position with the Company, a director, officer or employee may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects directors, officers and employees to take their responsibility very seriously

> and to provide prompt, accurate answers to inquiries related to the Company's public disclosure requirements.

70. In its fourth section, titled "Sanctions; Disciplinary Actions," the Code of Conduct states the following:

> We expect everyone subject to this Code to act with the highest integrity and we are committed to acting professionally, fairly and with integrity in all our business dealings and relationships.
>
> Violations of this code will not be condoned. Any employee who breaches this policy may face disciplinary action, which could result in dismissal for gross misconduct. Any non-employee who breaches this policy may have their contract terminated with immediate effect.

71. Regarding "Oversight, Reporting and Protection," the Code of Conduct also provides that "[t]he Audit Committee shall take all action they consider appropriate to investigate any violations reported to them. If a violation has occurred, the Company will take such disciplinary or preventive action as it deems appropriate, after consultation with the Audit Committee."

**<u>Corporate Governance Guidelines</u>**

72. Medical Properties' Corporate Governance Guidelines (the "Guidelines") outline several responsibilities of the Board of Directors. Under the section "Director Responsibilities," the Guidelines state the following, in relevant part:

> The basic responsibility of the directors is to direct the management of the business and affairs of the Company and, in doing so, to exercise their business judgment and to act in a manner that they reasonably believe to be the best interests of the Company and its stockholders. In discharging that obligation, directors should be entitled to rely on the honesty and integrity of the Company's senior management and its outside advisors and auditors. Generally, the directors should be entitled to have the Company purchase directors' and officers' liability insurance on their behalf, to the benefits of indemnification to the fullest extent permitted by law and the Company's charter, bylaws and any indemnification agreements, and to exculpation as provided by state law and the Company's charter.

73. In a section entitled "Director Qualifications," the Code of Conduct sets forth the following:

> Directors should (i) possess the highest personal and professional ethics, integrity, and values; (ii) have, or demonstrate an ability and willingness to acquire in short order, a clear understanding of the Company's business; (iii) be committed to representing the long-term interests of the Company's stockholders; and (iv) be willing to devote sufficient time to carry out their duties and responsibilities effectively and be committed to serving on the Board of Directors for an extended time.

**Audit Committee Charter**

74. At all relevant times, the Company had in place its Audit Committee Charter which sets forth the specific duties and responsibilities of the Audit Committee – comprised of Defendants Dawson, Sparks, and Thompson. The Audit Committee Charter provides that the Audit Committee "will assist the Board of Directors . . . in fulfilling its oversight responsibilities" of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditors.

75. In a section entitled "Purpose," the Audit Committee Charter also states, in relevant part:

> The Committee will also assist the Board in monitoring the Company's compliance with the Code of Ethics and Business Conduct and in overseeing the Company's system of disclosure controls and procedures and internal controls over financial reporting.

76. In a section titled "Duties and Responsibilities," the Audit Committee Charter describes the Audit Committee's specific responsibilities, stating the following:

> • The Committee shall discuss with management and independent auditors significant financial reporting issues and judgments made in connection with preparation of the Company's financial statements, including significant changes in the selection or application of accounting principles, major issues as to the

adequacy of internal controls, and any special steps adopted in light of material control deficiencies;

• The Committee shall review and discuss with management and the independent auditors the annual audited financial statements and quarterly financial statements, including the Company's specific disclosures in Management's Discussion and Analysis of Financial Condition and Results of Operations and the results of the independent auditor's reviews of the quarterly financial statements, and recommend to the Board whether the annual audited financial statements should be included in any Form 10-K to be filed by the Company;

• The Committee shall discuss with management and the independent auditor the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analyst and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made);

• The Committee shall discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies;

• The Committee shall review any significant matters contained in reports prepared by the internal auditing department and meet privately with the internal audit manager each quarter to discuss concerns relating to internal controls or accounting and auditing matters;

• The Committee shall meet with Company senior management periodically to review: major financial risk exposures; material legal issues; plans for disaster recovery, risk management activities, business issues which may affect financial results, ethical standards and conduct, Management Information Systems activities;

• The Committee shall discuss with management the Company's major financial risk exposure and the steps management has taken to monitor and control such exposure, including the Company's risk assessment and risk management policies;

• The Committee shall monitor compliance of the Company's employees with its standards of business conduct and conflict of interest policies and review reports and disclosures of insider and affiliated party transactions.

## DUTIES OF THE DIRECTOR DEFENDANTS

77. As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices

and policies and assuring the integrity of its financial and business records.

78. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

79. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

80. Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

81. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

82. Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

83. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

84. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

85. Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

86. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

87. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and

useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

88. At the time this suit was filed, the Board was comprised of nine (9) members – the Director Defendants, as defined at ¶ 18, *supra*, along with Defendants Aldag and Hamner (collectively in this section, the "Director Defendants"). Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

89. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

90. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

91. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

92. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the

Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

**Defendant Aldag**

95. Defendant Aldag neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its President and CEO) is an employee of the Company who derives substantially all of his income from his employment with Medical Properties, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Aldag cannot independently consider any demand to sue himself for breaching his fiduciary duties to Medical Properties, because that would expose him to liability and threaten his livelihood.

96. As CEO, Defendant Aldag also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Aldag could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Aldag is therefore futile.

97. In addition, Defendant Aldag receives lucrative compensation in connection with his employment with Medical Properties. Defendant Aldag is not independent from Defendants Thompson, Stewart and Sparks as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Aldag. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Aldag could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

98. Defendant Aldag has served as a Company director throughout the Relevant Period. As a director, Defendant Aldag was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Aldag failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

99. Defendant Aldag, during the Relevant Period, as a trusted senior officer of the Company, conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect

corporate assets.

100. Because of Defendant Aldag's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Aldag is unable to comply with his fiduciary duties and prosecute this action. Defendant Aldag is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

101. Moreover, Defendant Aldag personally made the statements in the August 9, 2023 earnings call and signed the 2Q23 10-Q, each of which contained false and misleading statements, and faces a substantial likelihood of liability therefor.

102. Defendant Aldag is neither independent nor disinterested. Any demand upon Defendant Aldag is futile and, thus, excused.

**<u>Defendant Dawson</u>**

103. Defendant Dawson has served as a Company director at all relevant times hereto. As a director, Defendant Dawson was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Dawson failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

104. As a trusted Company director, Defendant Dawson conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

105. Defendant Dawson also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Dawson is required to, *inter alia*: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) compliance with the Code of Ethics and Business Conduct; and (iv) overseeing the Company's system of disclosure controls and procedures and internal controls over financial reporting. Despite this, Defendant Dawson failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Dawson faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

106. Additionally, in connection with his role as a Company director, Defendant Dawson receives substantial income. Accordingly, Defendant Dawson cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

107. Defendant Dawson is neither independent nor disinterested. Any demand upon Defendant Dawson is futile and, thus, excused.

**Defendant Mozingo**

108. Defendant Mozingo has served as a Company director at all relevant times hereto. As a director, Defendant Mozingo was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure

the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Mozingo failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

109. As a trusted Company director, Defendant Mozingo conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

110. Additionally, in connection with her role as a Company director, Defendant Mozingo receives substantial income. Accordingly, Defendant Mozingo cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

111. Defendant Mozingo is neither independent nor disinterested. Any demand upon Defendant Mozingo is futile and, thus, excused.

**Defendant Murphy**

112. Defendant Murphy has served as a Company director at all relevant times hereto. As a director, Defendant Murphy was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Murphy failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

113. As a trusted Company director, Defendant Murphy conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

114. Additionally, in connection with her role as a Company director, Defendant Murphy receives substantial income. Accordingly, Defendant Murphy cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

115. Defendant Murphy is neither independent nor disinterested. Any demand upon Defendant Murphy is futile and, thus, excused.

**Defendant Pitman**

116. Defendant Pitman has served as a Company director at all relevant times hereto. As a director, Defendant Pitman was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Pitman failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

117. As a trusted Company director, Defendant Pitman conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and

consciously disregarded her duties to protect corporate assets.

118. Additionally, in connection with her role as a Company director, Defendant Pitman receives substantial income. Accordingly, Defendant Pitman cannot reasonably and objectively consider a demand to sue the Board who control her continued compensation, including herself.

119. Defendant Pitman is neither independent nor disinterested. Any demand upon Defendant Pitman is futile and, thus, excused.

**Defendant Sparks**

120. Defendant Sparks has served as a Company director at all relevant times hereto. As a director, Defendant Sparks was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Sparks failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

121. As a trusted Company director, Defendant Sparks conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

122. Defendant Sparks also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Sparks is required to, *inter alia*: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and

regulatory requirements; (iii) compliance with the Code of Ethics and Business Conduct; and (iv) overseeing the Company's system of disclosure controls and procedures and internal controls over financial reporting. Despite this, Defendant Sparks failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Sparks faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

123. Additionally, in connection with his role as a Company director, Defendant Sparks receives substantial income. Accordingly, Defendant Sparks cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

124. Defendant Sparks is neither independent nor disinterested. Any demand upon Defendant Sparks is futile and, thus, excused.

**Defendant Stewart**

125. Defendant Stewart has served as a Company director at all relevant times hereto. As a director, Defendant Stewart was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Stewart failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

126. As a trusted Company director, Defendant Stewart conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

127. Additionally, in connection with his role as a Company director, Defendant Stewart receives substantial income. Accordingly, Defendant Stewart cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

128. Defendant Stewart is neither independent nor disinterested. Any demand upon Defendant Stewart is futile and, thus, excused.

**Defendant Thompson**

129. Defendant Thompson has served as a Company director at all relevant times hereto. As a director, Defendant Thompson was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Thompson failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

130. As a trusted Company director, Defendant Thompson conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

131. Defendant Thompson also serves as a member of the Audit Committee and holds additional duties by virtue thereof. In particular, Defendant Thompson is required to, *inter alia*: (i)

the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) compliance with the Code of Ethics and Business Conduct; and (iv) overseeing the Company's system of disclosure controls and procedures and internal controls over financial reporting. Despite this, Defendant Thompson failed to fulfil these additional duties by allowing the false and misleading statements to be made and also by not correcting them. Therefore, Defendant Thompson faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

132. Additionally, in connection with his role as a Company director, Defendant Thompson receives substantial income. Accordingly, Defendant Thompson cannot reasonably and objectively consider a demand to sue the Board who control his continued compensation, including himself.

133. Defendant Thompson is neither independent nor disinterested. Any demand upon Defendant Thompson is futile and, thus, excused.

**Additional Reasons Demand is Futile**

134. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

135. The Company, at all material times, had its Code of Conduct, Business Code, and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct, Business Code, and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company

upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

136. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

137. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

138. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

139. Publicly traded companies, such as Medical Properties, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

140. Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

### (Against The Individual Defendants for Breach of Fiduciary Duties)

141. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

143. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

144. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by making or permitted false and misleading statements and/or failing to disclose that: (i) the Recap Transaction was subject to regulatory approval and had in fact been placed on hold by the DMHC; (ii) accordingly, Medical Properties had misrepresented the regulatory process for the Recap Transaction's approval; and (iii) as a result of the foregoing, Medical Properties overstated the approval prospects and benefits of the Recap Transaction. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

146. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**COUNT II**

**(Against The Individual Defendants for Gross Management)**

147. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

148. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

149. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

150. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**COUNT III**

**(Against the Individual Defendants for Waste of Corporate Assets)**

151. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

153. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

154. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**COUNT IV**

**(Against The Individual Defendants for Unjust Enrichment)**

155. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

157. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

158. Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**COUNT V**

**(Against the Director Defendants for Aiding and Abetting)**

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160. The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Individual Defendants.

161. Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law as alleged herein, and failing to report the same.

162. As a result, the Director Defendants substantially assisted the Individual Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

163. As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

164. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT VI

### (Against the Officer Defendants for Contribution Under Sections 10(b) and 21D of the Securities Exchange Act of 1934)

165. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166. Medical Properties, along with the Officer Defendants, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

167. The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing Medical Properties securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

168. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

169. The Officer Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

170. Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

171. As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

**COUNT VII**

**(Against the Officer Defendants for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5)**

172. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173. This Count is asserted on behalf of the Company against the Officer Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

174. During the Relevant Period, in connection with the Company's repurchases of Company shares, the Officer Defendants made, disseminated, or approved false or misleading statements about the Company specified herein, which they knew or deliberately disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or

misleading statements and the Officer Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

175. At the same time that the price of the Company's common stock was inflated due to the false and misleading statements made by the Officer Defendants, the Officer Defendants caused the Company to repurchase shares of its own stock at prices that were artificially inflated due to the Officer Defendants' false or misleading statements. The Officer Defendants engaged in a scheme to defraud the Company by causing the Company to purchase shares of Company stock at inflated prices.

176. The Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the Company's purchases of Company common stock during the Relevant Period.

177. The Officer Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the Company's purchase of Company common stock.

178. The Officer Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

179. As described above, the Officer Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misstatements and omissions of material facts set forth herein were either known to the Officer Defendants or were so that the Officer Defendants should have been aware of them.

180. As a result of the Officer Defendants' misconduct, the Company has suffered damages in that it paid artificially inflated prices for the Company common stock as part of the repurchase program and suffered losses when the true facts became known. The Company would not have purchased Company common stock at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by the Officer Defendants' false or misleading statements.

181. As a direct and proximate result of the Officer Defendants' wrongful conduct, the Company suffered damages in connection with its repurchases of Company common stock during the Relevant Period. By reason of such conduct, the Officer Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of Individual Defendants' breaches of their fiduciary duties;

C. Awarding, against the Director Defendants and in favor of the Company, damages sustained by the Company as a result of the Director Defendants' aiding and abetting of the Individual Defendants' breaches of fiduciary duty;

D. Awarding, against the Officer Defendants and in favor of the Company, all contribution and indemnification under Sections 10(b) and 21D of the Securities Exchange Act of 1934;

E. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 21, 2024

*/s/ Jaime W. Luse*___________
Jaime W. Luse, Bar No. 27394
Jung Yong Lee, Bar No. 22077
**Tydings & Rosenberg LLP**
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
Email: jluse@tydings.com

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston (pro hac forthcoming)
Thomas J. McKenna (pro hac forthcoming)
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, CHARLES WILSON, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Medical Properties Trust, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do no have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Medical Properties Trust, Inc. common stock at all relevant times.



CHARLES WILSON